**IN THE UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| KENTUCKY STATE DISTRICT COUNCIL OF CARPENTERS PENSION TRUST FUND, on Behalf of Itself and All Others Similarly Situated, | Case No. 4:10-cv-00332-HDV-CFB |
| | CLASS ACTION |
| Plaintiff, | **AMENDED PETITION AT LAW** |
| vs. | |
| ROBERT J. MYERS, KENNETH H. HAYNIE, JOHNNY DANOS, WILLIAM C. KIMBALL, DIANE C. BRIDGEWATER, JEFFREY M. LAMBERTI, RICHARD A. WILKEY, H. LYNN HORAK, and CASEY'S GENERAL STORES, INC., | |
| | DEMAND FOR JURY TRIAL |
| Defendants | |

**SUMMARY OF THE ACTION**

1.     This is a stockholder class action brought by plaintiff on behalf of holders of common stock of Casey's General Stores, Inc. ("Casey's" or the "Company") against Casey's and the Board of Directors of Casey's (the "Board" or the "Individual Defendants").  This action arises out of the Individual Defendants' violations of state law and §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, as well as their breaches of fiduciary duty in entrenching themselves in their positions through disproportionate, draconian, and preclusive defensive measures that have harmed the Class (as defined herein).  As detailed herein, the Board breached its fiduciary duties when in response to expressions of interest in a potential strategic transaction from Alimentation Couche-Tard Inc. ("Couche-Tard"), it erected a number of preclusive and coercive defensive measures to ward off Couche-Tard instead of engaging in good-faith negotiations.  In addition, the Board has made materially misleading statements to its shareholders in order to deter them from

tendering their stock to Couche-Tard and from voting for Couche-Tard's alternative slate of directors.  This action seeks equitable relief compelling the Board to properly exercise its fiduciary duties, forcing it to rescind these draconian measures, and ensuring full and fair disclosure of all material information.

2.      On April 9, 2010, Couche-Tard publicly disclosed its interest in acquiring Casey's.  In its announcement, Couche-Tard revealed for the first time that it approached Casey's about a strategic transaction in October 2009.  Between that time and its public announcement, Couche-Tard made numerous attempts to engage the Board in discussions regarding a potential transaction and even made a preliminary offer in writing.  Yet, despite the cooperative and non-coercive nature of Couche-Tard's advances, the Individual Defendants refused to negotiate with or interact at all with Couche-Tard.

3.      Rather than immediately take its offer straight to shareholders, Couche-Tard, in its public disclosure on April 9, 2010, simply requested that the Board or its representatives meet with Couche-Tard's representatives.  The Board again rejected Couche-Tard's proposal that same day out of hand, without negotiating or even discussing the offer with Couche-Tard.

4.      Due to the Board's refusal to engage in negotiations, Couche-Tard was forced to take its offer directly to Casey's shareholders.  On June 2, 2010, Couche-Tard announced a tender offer for the Company's stock at $36.00 per share (the "Tender Offer").  In that same press release, Couche-Tard stated that it was planning to nominate its own slate of directors for election to the Board.  The Board immediately recommended that Casey's shareholders not tender their stock in to the Tender Offer.  Notably, in recommending against the Tender Offer, the Board did not say it would consider offers at a higher price nor that it was interested in a transaction that would increase shareholder value.  The Board also failed to articulate any financial basis for its recommendation.

5.      The Board, in its recommendation, contended without support that the Couche-Tard proposal would adversely impact Casey's other constituencies because of "the differences in the manner in which Casey's and Couche-Tard are operated and managed."  Couche-Tard's letter, however, indicated that its proposed transaction would likely have only a minimal effect, if any, on

the Company's constituencies.  The Tender Offer also presented the Company's shareholders with the chance to receive a 14 percent premium to Casey's closing price the previous day, a 24 percent premium to Casey's one year average closing price and the opportunity to negotiate an even higher price.  The only downside was for the Individual Defendants, who stood to lose their lucrative positions on the Board if the Tender Offer was successful.  Accordingly, it is the Board through its actions, and not Couche-Tard, that has demonstrated it is not concerned with the best interests of the Company's shareholders, employees, customers, or the communities in which Casey's operates.

6.      In order to secure their continued positions, the Board placed a number of impediments to the successful completion of the Tender Offer.  Specifically, in an effort to entrench themselves and make the Company less attractive to potential strategic partners, the Board: (i) adopted a poison pill with a one-year term (the "Poison Pill") on April 16, 2010; (ii) entered into amended employment agreements with numerous officers that provided for their continued employment even if there is a change of control; and (iii) initiated meritless litigation against Couche-Tard.  These actions are disproportionate to the threat posed by the Tender Offer and unreasonably make an acquisition of the Company prohibitively expensive.

7.      Worse still, the Board made material misstatements and omitted material information in its recommendation that Casey's shareholders not tender their stock to Couche-Tard contained in the Schedule 14D-9 the Board filed with the SEC on June 8, 2010 (the "14D-9"), and amendments thereto, and the Schedule 14(a) filed with the SEC on August 12, 2010 (the "Proxy"), and amendments thereto, in violation of its fiduciary duties and federal law.  Specifically, the Board omitted and/or misrepresented material information regarding: (i) the Tender Offer and Couche-Tard's ability to finance it; (ii) the negligible impact of the Tender Offer on Casey's constituencies; (iii) the impact of the Company's proposed share repurchase plan (the "Recapitalization") on the Company's stand-alone value; (iv) valuation of the Company's crown jewel asset, its real estate holdings; (v) the Company's financial projections; (vi) the data and inputs underlying the opinion of the Board's financial advisor, Goldman Sachs; (vii) the costs and benefits associated with the

Company's remodeling project; and (viii) the potential impact of the Company's so-called "poison put" on the upcoming shareholder vote on election of directors.

8.     Despite the obstacles that the Board has put in its way, Couche-Tard has remained dedicated to acquiring the Company.  On July 22, 2010, Couche-Tard raised its offer price to $36.75.[1]  In light of Couche-Tard's resolve, the Board has become increasingly desperate.  The Board again rejected Couche-Tard's offer on July 27, 2010.  The next day, the Board announced the Recapitalization, pursuant to which Casey's plans to acquire up to 25 percent of its outstanding stock at a price between $38 and $40 through a Dutch auction.

9.     To fund the Recapitalization, however, the Company must take on $569 million worth of additional debt.  The Board's true motivation for undertaking the Recapitalization was revealed when it made public the debt financing agreement.  The debt financing agreement contains a so-called "poison put" provision, which triggers penalty payments in the event that an entity such as Couche-Tard acquires more than 35 percent of the Company stock, which  adds an additional $2 per share to the costs of acquiring the Company (which would go to the new bondholders instead of Casey's shareholders).  The poison put also triggers repayment in the event of a change in control of the Board, a provision which illegally disenfranchises Casey's shareholders in the upcoming battle for corporate control to be waged at the ballot box at Casey's next shareholder meeting set for September 23, 2010.  The poison put places shareholders in the untenable position of triggering the debt repayments if they choose to elect Couche-Tard's slate of directors, which strips shareholders of the property right associated with their shareholder franchise.

10.     The Board's adoption of the disproportionate measures and its refusal to even talk with Couche-Tard are in violation of their fiduciary duties of care and loyalty.  The Board's refusal to negotiate in good faith and present the Company's shareholders an opportunity to fairly consider

---

[1]Though initially set to expire on July 9, 2010, Couche-Tard extended the Tender Offer to August 30, 2010.

Couche-Tard's offer is causing substantial harm to Casey's shareholders.  The Company's issuance of the materially misleading 14D-9 and Proxy is in violation of federal law.  In sum, the Board has demonstrated a refusal to act in accordance with the duties prescribed to them by law.  Instead, these Individual Defendants have demonstrated a course of action consistent only with their own self-serving motives – namely, creating barriers to a change of control in order to ensure that they will retain their prestigious and lucrative positions with the Company.

11.     As detailed herein, applicable law imposes upon the Individual Defendants the obligation to act in the best interests of Casey's and its public stockholders and to ensure that no conflicts of interest exist that would interfere with that mandate.  Accordingly, the Individual Defendants must immediately act to comply with their fiduciary duties by, among other things: (i) nullifying and withdrawing the draconian, disproportionate, and preclusive measures; (ii) refraining from adopting, and rescinding, any similar measures; and (iii) providing shareholders with a fair process to examine the strategic alternatives available to the Company.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  Defendants are all citizens of Iowa.  Kentucky State District Council of Carpenters Pension Trust Fund is a citizen of Kentucky and Indiana, not Iowa.  This Court also has jurisdiction pursuant to 15 U.S.C. § 78bb(f)(3)(A)(i) because it is a class action based upon the statutory or common law of Iowa, the Company's state of incorporation, and thus may be maintained in Federal court.  This Court also has jurisdiction over claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all claims that are so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) Casey's maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Casey's shareholders, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14.    Plaintiff Kentucky State District Council of Carpenters Pension Trust Fund is a shareholder of Casey's.  Plaintiff is a citizen of Kentucky and Indiana.

15.    Defendant Casey's is an Iowa corporation incorporated in 1967 that operates convenience stores under the name "Casey's General Store," "HandiMart," and "Just Diesel" in nine Midwestern states, including Iowa, Missouri, and Illinois.  Casey's executive offices are located at One Convenience Blvd., Ankeny, Iowa.

16.    Defendant Robert J. Myers ("Myers") is President and Chief Executive Officer ("CEO") of Casey's and has been since June 2006.  Myers is also a Casey's director and has been since 2006. Myers was Chief Operating Officer of Casey's from May 2002 to June 2006 and Senior Vice President from December 1998 to May 2002.  Myers has been associated with Casey's since 1989.  Casey's paid defendant Myers the following compensation as an executive:

| Fiscal Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Change In Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $660,000 | $47,673 | $330,000 | $477,348 | $28,086 |

Defendant Myers is a citizen of Iowa.

17.    Defendant Kenneth H. Haynie ("Haynie") is a Casey's director and has been since 1987.  Casey's paid defendant Haynie the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $55,000 | $16,600 | $38 | $71,638 |

Defendant Haynie is a citizen of Iowa

18.    Defendant Johnny Danos ("Danos") is a Casey's director and has been since 2004.

Casey's paid defendant Danos the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $56,000 | $16,600 | $62 | $72,662 |

Defendant Danos is a citizen of Iowa.

19.    Defendant William C. Kimball ("Kimball") is a Casey's director and has been since

2004.  Casey's paid defendant Kimball the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2008 | $49,000 | $16,600 | $96 | $65,696 |

Defendant Kimball is a citizen of Iowa.

20.    Defendant Diane C. Bridgewater ("Bridgewater") is a Casey's director and has been

since 2007.  Casey's paid defendant Bridgewater the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $62,000 | $16,600 | $96 | $78,696 |

Defendant Bridgewater is a citizen of Iowa.

21.    Defendant Jeffrey M. Lamberti ("Lamberti") is a Casey's director and has been since

March 2008.  Casey's paid defendant Lamberti the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | Option Awards | All Other Compensation | Total Compensation |
|---|---|---|---|---|
| 2009 | $46,000 | $16,600 | $96 | $62,696 |

Defendant Lamberti is a citizen of Iowa.

22.    Defendant Richard A. Wilkey ("Wilkey") is a Casey's director and has been since

December 2008.  Casey's paid defendant Wilkey the following compensation as a director:

| Fiscal Year | Fees Paid In Cash | All Other Compensation | Total Compensation |
|---|---|---|---|
| 2009 | $33,000 | $62 | $33,062 |

Defendant Wilkey is a citizen of Iowa.

23.     Defendant H. Lynn Horak ("Horak") is a Casey's director and has been since September 2009.  Defendant Horak is a citizen of Iowa.

24.     The defendants named above in ¶¶16-23 are sometimes collectively referred to herein as the "Individual Defendants."

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

25.     The directors and officers of a publicly traded corporation owe the highest duties of loyalty, good faith, fair dealing, and care to shareholders.  In accordance with their duties of loyalty and care, the Individual Defendants, as directors and/or officers of Casey's, are obligated to:

(a)     objectively evaluate any reasonable proposed transaction, including the Tender Offer, to determine whether it is in the best interests of the Company, its public shareholders and the Company's other constituencies;

(b)     fully and fairly disclose all material information to shareholders when recommending that they do or do not take action;

(c)     refrain from contractually prohibiting themselves from complying with their fiduciary duties;

(d)     refrain from participating in any transaction in which their loyalties are divided; and/or

(e)     refrain from placing any unreasonable or preclusive hurdles to a potential acquisition of the Company.

26.     Plaintiff alleges herein that the defendants, separately and together, have violated and are continuing to violate the fiduciary duties they owe to plaintiff and the Company's other public shareholders, including the duties of loyalty and due care.  Defendants' actions were draconian, disproportionate, and unreasonable.  Moreover, the Individual Defendants' actions will have a

preclusive effect of preventing shareholders from making their own independent choice regarding Couche-Tard's non-coercive Tender Offer and dissuade additional offers for the Company.

27.     Indeed, by failing to adequately consider the Tender Offer and instead erecting impediments to it, the Individual Defendants cannot possibly satisfy their duties of care and loyalty.

28.     As a result of their failure to consider value-maximizing alternatives in good faith, the Individual Defendants, as a matter of law, have breached their fiduciary duties of good faith and fair dealing owed to the Company and its shareholders.

## THE BOARD REFUSES TO ENTER INTO NEGOTIATIONS WITH COUCHE-TARD

29.     From Couche-Tard's initial approach through the present, the Board has refused to participate in any discussions with Couche-Tard, about a transaction that could increase shareholder value.  When Couche-Tard first approached the Board on October 6, 2009 about entering into a strategic transaction, the Board simply did not respond.

30.     On November 16, 2009, Couche-Tard again approached the Board about a possible strategic transaction.  This time defendant Myers told Couche-Tard to submit any proposal in writing to the Board.

31.     On March 9, 2010, Couche-Tard made an unsolicited, all-cash offer to the Board to acquire Casey's for $36.00 a share, representing an aggregate purchase price of about $1.85 billion. Notably, Couche-Tard's offer was based solely on publicly available information, without the benefit of any due diligence.

32.     On March 29, 2010, without speaking with Couche-Tard or Couche-Tard's financial advisors, the Board in a short letter, rejected Couche-Tard's offer, and declined to make a counteroffer.  The letter did not disclose the reasons for the Board's decision.  Casey's also did not disclose to its shareholders that it had been approached by Couche-Tard.  Undeterred, on March 30, 2010, Couche-Tard reiterated its interest in entering into negotiations regarding a strategic transaction by sending a letter to the Board.  On April 7, 2010, Casey's again rejected Couche-Tard's proposal without speaking with Couche-Tard or its financial advisors.

33.     Unable to elicit any meaningful response from the Board, Couche-Tard was forced on April 9, 2010, to disclose its offer publicly in an open letter to Casey's Board and its CEO, defendant Myers.  In particular, the letter stated:

April 9, 2010

The Board of Directors of Casey's General Stores, Inc.
c/o Robert J. Myers
Casey's General Stores, Inc.
One Convenience Blvd.
Ankeny, Iowa 50021

Mr. Myers:

As conveyed to you in our letters dated March 9, 2010 and March 30, 2010, our Board of Directors has authorized a proposal to acquire all of the outstanding shares of common stock of Casey's General Stores, Inc. ("Casey's") at a price of $36.00 per share in cash. Despite our repeated efforts starting in October 2009 to engage in negotiations, and without the benefit of discussing our proposal with us or our advisors, your Board of Directors unanimously rejected our proposal. Our goal remains to work with you to agree to a negotiated transaction. However, due to your unwillingness to engage in discussions and the unique opportunity presented by our proposal for your shareholders to realize full and immediate value, we are compelled to make this proposal known to your shareholders.

As we have stated in our prior correspondence, including our initial contact in October 2009, we believe that a combination of Casey's and Alimentation Couche-Tard Inc. ("Couche-Tard") presents an exciting opportunity to create significant value for our respective shareholders, employees, business partners and other constituencies. The transaction consideration implies a last twelve months (as of January 31, 2010) EBITDA multiple of 7.4x and a price of $1.3 million per store, which compares favorably to corresponding metrics of publicly traded companies and precedent transactions in our industry.  Our proposal represents a 14% premium over Casey's closing price on April 8, 2010, a 17% premium over Casey's 90-calendar day average closing price and a 24% premium over Casey's one-year average closing price.

Couche-Tard is the largest independent convenience store operator in North America (whether integrated with a petroleum company or not) in terms of number of company-operated stores.  As of April 8, 2010, we had an enterprise value of $4.1 billion. As you know, we have successfully completed similar transactions, including the acquisition of Circle K from ConocoPhillips and transactions with ExxonMobil, Shell, BP and Spirit Energy. As such, we are confident that we can successfully

combine our two companies to quickly maximize the benefits for our respective constituencies.

We have an extremely high regard for your operations, management and talented employees. Our operations are highly decentralized and we have a track record of keeping most of the existing management and employees in place as we did in the Circle K acquisition and our other transactions.

Our senior management team and our legal and financial advisors have already completed extensive analysis and due diligence of Casey's based on publicly available information. As previously mentioned, we have retained Credit Suisse Securities (USA) LLC as our financial advisor and Dewey & LeBoeuf LLP as our legal counsel. We have also retained Innisfree M&A Incorporated as our proxy solicitor. We are prepared to proceed expeditiously and, with your cooperation, believe we can be in position to execute a definitive agreement within two to three weeks.

Given our financial strength and the strong support of our financing sources, we do not anticipate that financing for the proposed transaction will be an issue.

I want to emphasize to you and your Board of Directors our seriousness about this proposal and our commitment to a combination of Casey's and Couche-Tard. We are convinced that this proposal is compelling for Casey's and its shareholders and provides a unique opportunity for Casey's shareholders to realize full and immediate value. We also firmly believe that, given our approach to acquisitions, this transaction would be in the best interests of your employees, customers and the communities in which you operate. We believe that your continued failure to engage in discussions about our proposal is not in the best interest of your shareholders or any of your other constituencies.

Our strong preference is to work with you to negotiate a mutually acceptable transaction and avoid unnecessary costs. Our senior management team and our legal and financial advisors remain ready to meet with you and your representatives at your earliest convenience to discuss our proposal in detail. However, if you continue to refuse to engage in meaningful negotiations, we are prepared to submit our proposal directly to your shareholders and commence a proxy contest to replace your Board of Directors.

We urge you and your Board of Directors to reconsider our proposal. We look forward to a timely and favorable response.

Sincerely,

/s/ Alain Bouchard

Alain Bouchard
President and Chief Executive Officer

34.     The Board publicly rejected Couche-Tard's proposal that same day in a letter signed by defendant Myers expressing his "disappointment" with Couche-Tard's offer and that the Board "unanimously determined to reject your proposal…."  The Board stated that the offer significantly undervalued the Company and is not in the best interests of Casey's.  The Board's letter did not explain why Couche-Tard's offer undervalued the Company, how much the offer undervalued the Company, why it was not in the best interests of the Company, nor why it would not negotiate with Couche-Tard.

35.     Unable to engage with the Board in negotiations, Couche-Tard announced the Tender Offer on June 2, 2010.  The Tender Offer is contingent on the Board redeeming the Poison Pill.  The Board advised shareholders not to take any action regarding the Tender Offer that same day.  On June 8, 2010, the Board advised shareholders not to tender their stock to Couche-Tard.

36.     On July 22, 2010, despite the combative position of the defendants, Couche-Tard increased its offer for the Company to $36.75.  Defendants again rejected Couche-Tard's proposal without even talking to Couche-Tard.

37.     The Individual Defendants' refusals are not the product of valid business judgment. Without talking to Couche-Tard or its advisers, the Board has failed to obtain and consider all reasonably available information.  The Board instead has flatly rejected each of Couche-Tard's advances.

## THE BOARD ENACTS DRACONIAN, PRECLUSIVE, AND DISPROPORTIONATE MEASURES TO WARD OFF COUCHE-TARD

### The Poison Pill

38.     On April 16, 2010, the Board adopted the Poison Pill to make any acquisition of the Company prohibitively expensive, if not impossible, through the issuance of preferred share purchase rights ("Rights").  The Poison Pill works in the following way:

(a)     The Rights become exercisable upon the earlier of: (i) the date that Casey's learns that a person (with certain exceptions not applicable here) has acquired or obtained the right to acquire beneficial ownership of 15 percent or more of the outstanding common stock (thus becoming an "Acquiring Person"), or (ii) the date of the first public disclosure of an intention to commence a tender or exchange offer which would result in any person acquiring beneficial ownership of 15 percent or more of the outstanding common stock.

(b)     When a party becomes an Acquiring Person, all Rights other than those held by the Acquiring Person "flip-in." This means that each Right becomes exercisable and entitles its holder to purchase, at a purchase price of $95, the number of 1/1000ths of a share of Casey's Series A Preferred Stock equal to the number of shares Casey's common stock worth twice the purchase price, or $190, at the then-current market value.

(c)     If Casey's engages in a merger, the Rights "flip-over" and become exercisable for shares of the Acquiring Person's common stock at the bargain price of two shares for the price of one, based on the market price.

(d)     The Rights expire on April 15, 2011, unless extended, redeemed or exchanged.

39.     In the event shareholders exercise their flip-in, the Company's outstanding equity will substantially increase, and the price to purchase the entire Company would become exorbitant.  If the flip-over provision is triggered, the capital structure of an acquiring entity would be significantly impaired and the interests of its shareholders drastically diluted.  Under either scenario, the practical effect of the Poison Pill is that it becomes financially unfeasible to acquire the Company.

**The Amended Employment Agreements**

40.     In an effort to further entrench and enrich the Board and render any potential transaction unreasonably expensive, on April 16, 2010, the same day the Board adopted the Poison Pill, the Individual Defendants approved a new employment agreement with defendant Myers, extending his employment term to April 30, 2013, at a base salary of $660,000 per year, despite the fact that his previous employment agreement was not set to expire until June 21, 2011.  In addition, on May 27 and June 1, 2010, the Company entered into amended employment agreements with three other executive officers and eight additional officers.   The agreements provide for "continued employment of the officer for two years … in the same position and with the same duties … and at the same or similar location as of immediately prior" in the event of a change in control in the Company.  The officer will also be entitled to the same base pay rate as his/her highest pay rate in the prior 12 months, an annual cash bonus equal to the officer's average bonus over the prior three years, and continued participation in the Company's benefit plans.

41.     Under the amended employment agreements, any covered officer may also terminate his/her own employment for "good reason" and still receive the benefits listed above.  Good reason includes: (i) an assignment of duties inconsistent with the officer's existing position; (ii) a reduction in compensation; (iii) the requirement to relocate to another office; and (iv) certain terminations of employment.   Further, the amended employment agreements included an amendment to the definition of a change in control to provide that a change in control will now mean the consummation of a merger or other transaction rather than shareholder approval of a merger or other transaction.  These actions reveal that the Individual Defendants are concerned only with preserving their positions or, at least, preserving the income they stand to gain from those positions.

**The Meritless Litigation**

42.     In addition to the above draconian measures, the Board has directed the Company to initiate litigation against Couche-Tard in an attempt to ward off Couche-Tard's advances and discourage other potential acquirers from coming forward.  On June 11, 2010, the Company filed a lawsuit captioned *Casey's General Stores, Inc. v. Alimentation Couche-Tard, Inc. et al*, No. 10-cv-

00265-JAJ, in United States District Court for the Southern District of Iowa.  The lawsuit accuses Couche-Tard of announcing its offer in order to drive up the Company's stock price so that Couche-Tard could sell its Casey's shares at a higher price.  Casey's argument makes little sense.  While Couche-Tard did net roughly $14 million from these sales, such an amount hardly outweighs the risks inherent in such a reckless and visible transaction if conducted in a fraudulent manner, especially for a company whose revenues and gross profits in fiscal year 2009 were $15.7 billion and $2.4 billion, respectively.  In fact, Couche-Tard disclosed the exact amount of stock it sold on June 17, 2010, explaining that the gain from the sales would be used to offset the expenses incurred in making the Tender Offer.  Couche-Tard reiterated that it is "fully committed" to consummating the Tender Offer.

**The Dividend Increase**

43.     The Individual Defendants have also demonstrated that they are willing to risk the Company's long-term health in order to entrench themselves and prevent an acquisition.  On June 15, 2010, in an action designed to make the Company less attractive to potential suitors by reducing its cash on hand, the Company announced that it was going to issue a dividend far out of line with its previous dividends.  In fact, the $0.10 dividend announced on June 15, 2010 represented an increase of over 17.6 percent.  Prior to that announcement, the company had paid dividends of $0.085 (8.5 cents) on April 29, 2010, January 28, 2010, October 29, 2009, and July 30, 2009; and dividends of $0.075 (7.5 cents) on April 29, 2009, January 29, 2009, October 30, 2008, and July 30, 2008.  This is on top of the $6.9 million in legal and advisory fees the Company has paid so far to avoid having to consider Couche-Tard's offer.

**The Recapitalization**

44.     On or around July 28, 2010, Casey's announced that it would conduct a modified Dutch auction to acquire 25 percent of the Company's stock at a price not less than $38 and not higher than $40.  The Company valued the plan at $500 million and stated that it would be funded by a combination of debt and cash.  In order to raise the cash necessary to fund the Recapitalization, the

Company took on an additional $569 million in debt.  Again, the Board took this defensive measure without any discussion with Couche-Tard.

45.     Purely a defensive measure, the recapitalization plan now forces shareholders to consider an entirely different scenario.  The modified Dutch auction reaches out to only 25 percent of Casey's shareholders, inevitably leaving the remaining 75 percent out in the cold.

**The Poison Put**

46.     In order to raise the capital necessary to complete the Recapitalization, the Company entered into the Note Purchase Agreement dated August 9, 2010 (the "Note Purchase Agreement").  The Note Purchase Agreement is for the sale of $569 million worth of 5.22 percent of senior notes due August 9, 2020.  Casey's completed the private placement of the $569 million worth of debt on August 12, 2010.

47.     The Note Purchase Agreement contains a poison put feature that is triggered in the event that a party acquires 35 percent or more of the outstanding shares of Casey's *or* if shareholders decide to replace a majority of the Board.   In the event the poison put is triggered, Casey's is required to pay the noteholders approximately $95 million in penalties based on current treasury rates, in addition to the outstanding principal amount and accrued interest on the notes.  Couche-Tard estimates that the Note Purchase Agreement increases the price to acquire Casey's by $2 per share.  As Couche-Tard pointed out, "that is $2 that could have gone to the shareholders but instead is designated for noteholders in the event of any such acquisition."   Notably, if the Board had negotiated with Couche-Tard to raise its offer an additional $2, to $38.75, the proposed consideration would have been higher than the low end of the consideration offered in the Recapitalization.

48.     The triggering of the poison put in the event that a majority of the Board changes reveals the Defendants true motives.  Defendants are well aware that Couche-Tard is nominating its own slate of directors to the Board.  Now, the Board is trying to coerce Casey's shareholders to vote for its current members by threatening them with the costly poison put in the event the opposition slate of directors is elected.  Couche-Tard's press release issued on August 12, 2010, illuminates the many problems with the Note Purchase Agreement, stating:

Casey's recent action to transfer value from the Casey's shareholders to noteholders is outrageous. In our view, the private placement of notes recently completed by Casey's, which has a costly and unusual "poison put" feature in favor of the noteholders, is designed to entrench the Casey's Board and management at the expense of the Casey's shareholders. Under the "poison put" feature associated with the notes, Casey's is required to pay the noteholders approximately $95 million in penalties based on current treasury rates, in addition to the outstanding principal amount and accrued interest on the notes, if any party acquires 35% or more of the outstanding shares of Casey's. The financing makes it almost $2 per share more expensive to acquire Casey's – that is $2 that could have gone to the shareholders but instead is designated for noteholders in the event of any such acquisition. The Casey's Board and management are willing to give almost 5% of the company's current equity value (and almost 7% of the equity value pro forma for the self tender based on current stock prices) to the noteholders in a desperate attempt to keep their jobs at the expense of the Casey's shareholders.

The terms of the notes would also require Casey's to pay the noteholders approximately $95 million in penalties if the Casey's shareholders decide to replace a majority of the Casey's Board. The Casey's Board and management are trying to take the decision regarding the future of the company away from the Casey's shareholders by putting this expensive "poison put" in place. There are multiple forms of debt financing that feature change of control premiums far lower than the egregious 16% premium Casey's accepted. More typically, debt financing used by companies like Casey's has change of control premiums in the 1% to 3% range.

Since our initial approach to Casey's in October 2009, Casey's has had more than 10 months to consider a range of alternatives to maximize value for all of the Casey's shareholders. We believe the Casey's leveraged recapitalization plan confirms there are no other buyers for Casey's at a price exceeding Couche-Tard's offer. The Casey's leveraged recapitalization plan is designed to financially engineer a temporary and artificial increase in Casey's stock price, without increasing fundamental value to the Casey's shareholders. Additionally, it is a pretext for installing a coercive financing arrangement with a "poison put" mechanism designed to impede any takeover attempt. The actions taken by Casey's signal that it is unable to effectively deploy capital to create sustainable and profitable growth and value.

Despite our best efforts, Casey's Board and management team continue to refuse to negotiate with Couche-Tard. Casey's has not allowed us to conduct any due diligence and has taken actions to impede our premium offer, including undertaking the leveraged recapitalization with costly and unusual financing, commencing costly and meritless litigation against Couche-Tard, adopting a poison pill, and putting in place lucrative golden parachute arrangements for executives of Casey's. The shareholders of Casey's deserve a Board and management team that will act in the best interests of the Casey's shareholders

### THE MATERIALLY MISLEADING 14D-9 AND PROXY

49.     In order to coerce shareholders into not tendering their stock to Couche-Tard, defendants filed the materially misleading 14D-9 and Proxy.  The 14D-9 and Proxy omit and/or misrepresent material information about, among other things: (i) the Tender Offer and Couche-Tard's ability to finance it; (ii) the negligible impact of the Tender Offer on Casey's constituencies; (iii) the impact of the Company's proposed share repurchase plan on the Company's stand-alone value; (iv) valuation of the Company's crown jewel asset, its real estate holdings; (v) the Company's financial projections; (vi) the data and inputs underlying the opinion of the Board's financial advisor, Goldman Sachs; (vii) the costs and benefits associated with the Company's remodeling project; and (viii) the potential impact of the Company's so-called poison put on the upcoming shareholder vote on election of directors.  Specifically, the Proxy omits/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act.

50.     ***The data and inputs underlying Goldman Sachs' opinion that the consideration offered by Couche-Tard was inadequate from a financial point of view***.  As part of their recommendation that shareholders not tender their stock to Couche-Tard, defendants rely in part on the so-called "inadequacy opinion" offered by the Board's financial advisor, Goldman Sachs.  Goldman Sachs' inadequacy opinion is described on page 18 of the 14D-9 and the full text is set forth in Annex C to the 14D-9.  As set forth in Annex C, the Goldman Sachs inadequacy opinion relies in part on "certain internal financial analyses and forecasts for the Company prepared by its management and approved for our use by the Company (the "Forecasts")." The 14D-9, however, fails to disclose the Forecasts underlying Goldman Sachs' opinion.

51.     The omission of the Forecasts is material because Casey's management apparently blessed the Forecasts as the best estimate of the Company's future cash flows.  This information is critical to shareholders understanding of the intrinsic value of the Company, and without these projections, shareholders are unable to assess whether they agree with Goldman Sachs' assessment of inadequacy, and what weight, if any, they should place on Goldman Sachs' bought-and-paid-for inadequacy opinion in deciding whether to tender their shares to Couche-Tard.

52.     *The impact of the Recapitalization on the Company's stand-alone value.*  On page 17 of the 14D-9 and page 13 of the Proxy, defendants highlight the Company's cash position in relationship to its indebtedness.  The Recapitalization, however, increased the debt load of the Company by $569 million.  Nowhere in the 14D-9 or the Proxy, or the various amendments thereto, do defendants disclose any analysis reassessing the Company's cash versus indebtedness position after the Recapitalization is factored in.

53.     This information is material because in order to asses whether Casey's stand-alone prospects are preferable to Couche-Tard's premium offer, Casey's shareholders need to be provided with updated information about how the Recapitalization plan will affect those prospects.

54.     *The data and inputs underlying the Board's valuation of the Company's real estate holdings*.  In defendants' discussion of the reasons for recommending that shareholders not tender their stock on page 17 of the 14D-9 and pages 11-12 of the Proxy, they claim that the Company owns the land and buildings for 98 percent of its stores and that Couche-Tard would attempt to monetize this real estate through sale-leaseback transaction.  The 14D-9, however, fails to disclose the value of the Company's real estate holdings or the potential value to Couche-Tard of these sale-leaseback transactions.  Further, the 14D-9 does not disclose any analysis done by the Company, the Board, or its financial advisor on the value of the Company's real estate or potential actions to unlock such value.  Without this information shareholders are unable to ascertain the true value of the Company and its crown jewel asset – its real estate – on a stand alone basis or its comparative value to Couche-Tard.

55.     *The data and inputs underlying the Company's new store design and remodel program*.  In Defendants' discussion of the reasons for recommending that shareholders not tender their stock on page 16 of the 14D-9 and page 10 of the Proxy, they claim that the initial results of the Company's new store design and remodel program have been "very positive with significant increases above the chain-wide average in high margin prepared food sales."  However, the 14D-9 does not disclose the costs to complete a chain-wide remodel of the Company's stores.  Nor does the

14D-9 disclose the costs and benefits incorporated into the future cash flow projections of the Company.

56.     This information is material because, without it, Casey's shareholders are unable to determine the Company's long term growth potential through the remodel and new store design, and the impact of the costs and benefits of the plan on the Company's prospects going forward.

57.     *The Comparative EBITDA Multiple*.   In defendants' discussion of the reasons for recommending that shareholders not tender their stock on page 18 of the 14D-9 and pages 12-13 of the Proxy, they state that the Tender Offer represents a relatively low EBITDA multiple compared to historical industry trading.   The Board compares the Tender Offer's implied multiple to earnings before interest, tax, depreciation, and amortization (EBITDA) as 7.0x LTM EBITDA for the 12 months ended January 31, 2010.   It then compares this LTM EBITDA multiple to the five year average LTM EBITDA multiple for the convenience store sector.   The 14D-9 omits why the Board chose the five year average LTM EBITDA multiple, particularly since it is comparing that number to the Tender Offer's LTM EBITDA multiple only for the past 12 months.   Further, the 14D-9 does not provide shareholders with the Tender Offer's multiple to the Company's five year average LTM EBITDA.   The 14D-9 also omits that public trading is driven by projected EBITDA, and therefore comparing LTM multiples is inapposite.   This omitted information is material to Casey's shareholders because without it the shareholders are unable to discern the relative value of the Tender Offer as compared to the Company's public trading value in relation to other companies in its sector.

58.     *The affect of the Tender Offer on Casey's non-shareholder constituencies*.   In defendants' discussion of the reasons for recommending that shareholders not tender their stock on page 20 of the 14D-9 and 15 of the Proxy, defendants claim that consummation of the Tender Offer will adversely impact Casey's other constituencies because of "the differences in the manner in which Casey's and Couche-Tard are operated and managed."   The 14D-9, however, does not state what those differences are or why they would have an adverse impact on Casey's employees, suppliers, creditors, customers, and the communities in which Casey's operates.   The 14D-9 also

omits to explain how the Board learned of these differences in light of its refusal to engage in discussions with Couche-Tard.  This information is material to shareholders because without this information they are unable to determine whether the Board truly considered the impact of the proposed transaction on Casey's other constituencies and what impact, if any, this assessment should have on shareholders' decision whether to tender their shares to Couche-Tard.

59.     ***The ability of Couche-Tard to obtain financing***.  In Defendants' discussion of the reasons for recommending that shareholders not tender their stock on page 19 of the 14D-9 and 14 of the Proxy, defendants imply that Couche-Tard will have difficulty obtaining financing.  The 14D-9, however, fails to disclose that Couche-Tard has already received indications of interest from several prominent banks willing to finance the transaction.  This information is material because without it Casey's shareholders will be unable to assess the likelihood of the potential transaction closing and thus whether they should tender their shares to Couche-Tard.

60.     ***The Ramification of Voting For Couche-Tard's Nominees for the Board***.  On page 9 and 17 of the Proxy, Defendants explain that they issued the 5.22 percent Senior Notes due 2020 to fund the Recapitalization.  The Proxy omits, however, the details of the poison put that will drastically increase the costs to acquire the Company in the event that a majority of the Board changes.  This misrepresented information is material to shareholders because without it they will not fully understand the consequences of their votes for Couche-Tard's slate of directors or the extent of the actions that the members of the Board have taken in order to preserve their positions.

61.     The Individual Defendants were aware of their duty to disclose the foregoing material information in the 14D-9 and Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed in the 14D-9 and Proxy.  Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Transaction, and are thus threatened with irreparable harm.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action for itself and on behalf of all holders of Casey's common stock which have been or will be harmed by the conduct described herein (the "Class").  Excluded from the Class are the defendants and any individual or entity affiliated with any defendant.

63.     This action is properly maintainable as a class action.

64.     The Class is so numerous that joinder of all members is impracticable.  According to Casey's SEC filings, there were more than 50.9 million shares of Casey's common stock outstanding as of June 24, 2010.

65.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions include, *inter alia*:

(a)     whether the defendants violated §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 by filing the materially misleading 14D-9 and Proxy;

(b)     whether the Individual Defendants have breached any of their fiduciary duties to plaintiff and the other members of the Class, including the duties of good faith, due care, honesty and fair dealing;

(c)     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage offers for the Company or its assets;

(d)     whether the Individual Defendants have breached their fiduciary duties of candor to plaintiff and the other members of the Class in connection with the issuance of the 14D-9 and Proxy; and

(e)     whether the Individual Defendants have irreparably harmed plaintiff and the other members of the Class.

66.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

67.     Plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

68.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

69.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

70.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against Individual Defendants for Violations of
### §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder

71.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

72.     During the relevant period, the Individual Defendants disseminated the false and misleading 14D-9 and Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     The 14D-9 and Proxy were prepared, reviewed and/or disseminated by the Individual Defendants.  It misrepresented and/or omitted material facts, including material information about the true value of the Company.

74.     In so doing, the Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy and 14D-9.

75.     The Individual Defendants were at least negligent in filing the 14D-9 and Proxy with these materially false and misleading statements.

76.     The omissions and false and misleading statements in the 14D-9 and Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 14D-9 and Proxy Statement and in other information reasonably available to shareholders.

77.     By reason of the foregoing, the Individual Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

78.     Because of the false and misleading statements in the Proxy and 14D-9, plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation of §20(a) of the 1934 Act

79.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Casey's within the meaning of §20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of Casey's, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9 and Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

81.     Each of the Individual Defendants was provided with or had unlimited access to copies of the 14D-9 and Proxy and other statements alleged by plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation to vote for the Board's nominees and against Couche-Tard's proposals.  They were thus directly involved in the making of this document.

83.     By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

84.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff will be irreparably harmed.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

85.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

86.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties of good faith, loyalty, candor, and due care at the expense of plaintiff and other members of the Class.

87.     As alleged herein, the Individual Defendants have breached their fiduciary duties because, among other reasons, they:

(a)     failed to adequately consider the Tender Offer;

(b)      failed to apprise themselves of the true value of the Company, or the benefits associated with pursuing the Tender Offer or an alternate transaction, by, among other things, considering the merits of such transactions and engaging in a market check or canvas of the industry;

(c)      failed to ensure that the Poison Pill and the other draconian measures do not unreasonably preclude valuable transactions, including the Tender Offer;

(d)      made materially misleading statements in and omitted material information from the 14D-9 and Proxy; and

(e)      failed to otherwise take the steps necessary to comply with its fiduciary duties.

88.      As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a process that entrenches them in their prestigious and lucrative positions.  Furthermore, absent injunctive relief, plaintiff and the Class will continue to suffer irreparable harm as a result of the Individual Defendants' breaches of fiduciary duty, for which plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in its favor and in favor of the Class and against defendants as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring that the Individual Defendants' conduct of instituting the disproportionate and draconian measures and issuing the materially misleading 14D-9  and Proxy to fend off the Tender Offer is in breach of their fiduciary duties of loyalty, good faith, fair dealing, candor, and due care, and in violation of federal law;

C.      Preliminarily and permanently enjoining the Individual Defendants from placing their own interests ahead of those of Casey's and its shareholders by instituting unreasonable and disproportionate defensive measures;

D.      Preliminarily and permanently enjoining the Individual Defendants from initializing any defensive measure which may render the acquisition of the Company unduly burdensome or expensive for a potential acquirer;

E.      Ordering the Board to rescind or redeem the Poison Pill and/or declaring the Poison Pill invalid;

F.      Ordering the Individual Defendants to file an amended proxy that contains the materially omitted information detailed above;

G.      Invalidating the amendments to the employment agreements;

H.      Imposition of a constructive trust, in favor of plaintiff and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct and in breach of any duty owed to Casey's shareholders;

I.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

J.      Granting such further equitable or other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 20, 2010                      Respectfully submitted,

                                            ROBBINS UMEDA LLP
                                            BRIAN J. ROBBINS
                                            STEPHEN J. ODDO
                                            REBECCA A. PETERSON


                                                        s/ Stephen J. Oddo
                                            _____
                                            STEPHEN J. ODDO (admitted *pro hac vice*)

                                            600 B Street, Suite 1900
                                            San Diego, CA 92101
                                            Telephone: (619) 525-3990
                                            Facsimile:  (619) 525-3991
                                            soddo@robbinsumeda.com
                                            rpeterson@robbinsumeda.com

WANDRO, BAER & McCARTHY, P.C.
STEVEN P. WANDRO
KARA M. SIMONS
2501 Grand Avenue
Des Moines, IA  50312
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
swandro@2501grand.com

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN ROBBINS
RANDALL J. BARON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 338-4502
Facsimile:  (619) 239-3247
randyb@rgrdlaw.com
dwissbroecker@rgrdlaw.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that, on August 20, 2010, I caused this Amended Petition at Law to be filed with the Clerk of the Court via ECF, which will cause copies to be emailed to all counsel of record.


_____ s/ Stephen J. Oddo_____

518279